JASON R. HULL [11202]
JHULL@MOHTRIAL.COM
**MARSHALL OLSON & HULL, PC**
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

SCOTT J. FALGOUST*
SFALGOUST@BRYSONPLLC.COM
**BRYSON, HARRIS, Suciu, & DeMay, PLLC**
5301 CANAL BOULEVARD
NEW ORLEANS, LOUISIANA 70124
TELEPHONE: 919.585.5634

ATTORNEYS FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL

* PRO HAC VICE FORTHCOMING

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ETHAN STEINHOFF, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSTRUCTURE, INC.,<br><br>Defendant, | **COMPLAINT**<br>**[PROPOSED CLASS ACTION]**<br><br>JURY TRIAL DEMANDED<br><br>Case No. 2:26-cv-00387 |

1

Plaintiff Ethan Steinhoff ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Instructure, Inc. ("Instructure" or "Defendant"), and alleges as follows based on personal knowledge as to himself and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters:

## I. INTRODUCTION

1.      This is a class action arising from a large-scale data breach affecting users of the Canvas learning management system ("Canvas"), which is operated by Defendant and used by educational institutions throughout the United States, including in North Carolina. On or about April 30, 2026, an unauthorized criminal threat actor accessed Defendant's systems and exfiltrated personal information belonging to users of Canvas at thousands of educational institutions worldwide (the "Data Breach").

2.      Defendant has confirmed that the compromised information includes "names, email addresses, and student ID numbers, as well as messages among users" (collectively, "Private Information"), and has represented that it has no indication that passwords, dates of birth, government-issued identifiers, or financial information were involved.[1] Public reporting attributes the Data Breach to the criminal extortion group commonly known as "ShinyHunters," which has publicly listed Defendant on its dark-web data-leak site and threatened to release the stolen data unless Defendant pays a ransom.[2]

---

[1] See Instructure Status, https://status.instructure.com/incidents/9wm4knj2r64z (last visited May 7, 2026); WITN Web Team, Amarachi Uche, and Chris Cooke, Learning platform used by state school systems and ECU impacted by data breach, WITN (May 7, 2026), https://www.witn.com/2026/05/07/learning-platform-used-by-state-school-systems-impacted-by-data-breach-pcs-investigating/.

[2] Lawrence Abrams, Instructure confirms data breach as ShinyHunters claims attack, BleepingComputer (last visited May 7, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/.

3.      Canvas is a leading learning management system in the United States and is used by educational institutions ranging from K-12 districts to major colleges and universities. Plaintiff's institution, East Carolina University ("ECU"), confirmed on May 7, 2026 that ECU students, faculty, and staff were impacted by the Data Breach.[3] The North Carolina Department of Public Instruction ("NCDPI") similarly confirmed that NCDPI and "some North Carolina Public School Units" were impacted, and Pitt County Schools confirmed on the same day that it is investigating the impact.[4]

4.      Defendant held itself out as a trusted custodian of student information and education-related communications. Its public-facing materials emphasized its compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), and applicable state student privacy laws. Defendant promised, expressly and impliedly, to safeguard the Private Information entrusted to it.[5]

5.      Defendant broke those promises. Defendant failed to implement reasonable, industry-standard data security measures appropriate to the volume, sensitivity, and special legal status of the data in its custody. As a result, ShinyHunters was able to access Defendant's systems, exfiltrate user data on a large scale, and publish a ransom demand on its public leak site.

6.      Defendant had clear advance warning. Approximately eight months earlier, in or about September 2025, Defendant publicly disclosed a separate cybersecurity incident in which a criminal threat actor compromised Defendant's corporate Salesforce environment through a social-engineering attack (the "2025 Incident"). The 2025 Incident put Defendant on direct, actual

---

[3] WITN, supra.
[4] Id.
[5] See Product Privacy Notice, Instructure, https://www.instructure.com/policies/product-privacy-policy (last visited May 7, 2026).

notice that its data environments were exposed to compromise by organized threat actors.[6] Plaintiff alleges the existence of the 2025 Incident solely to establish foreseeability, the scope of Defendant's duty of care, the inadequacy of Defendant's post-incident remediation, and the unreasonableness of Defendant's subsequent security posture; Plaintiff does not allege an operational nexus between the 2025 Incident and the Data Breach.

7.    Defendant's response compounded the harm. Defendant detected service disruptions on or about April 30, 2026, and as of the filing of this Complaint has not provided complete or individualized notice to most affected users; instead, it has relied on a generic public status-page disclosure and has effectively delegated individualized notification to thousands of affected institutions, including ECU. The notification gap exposed Plaintiff and Class Members to ongoing risk of phishing, social engineering, and impersonation — a risk made acute precisely because the compromised dataset, by Defendant's own description, includes the substantive contents of users' private communications conducted within Canvas.

8.    Plaintiff Ethan Steinhoff is a college student at East Carolina University in Greenville, North Carolina, who used Canvas continuously throughout his enrollment to access course materials, submit assignments, view grades, and exchange messages with faculty, staff, and classmates. On the morning of May 7, 2026, ECU notified its students, faculty, and staff that they were impacted by the Data Breach.[7] As a direct and proximate result of Defendant's conduct, Plaintiff's name, ECU-issued email address, ECU-issued student identification number, and the contents of his Canvas Inbox communications were accessed by a criminal threat actor and remain at imminent risk of public release.

---

[6] Joe Fay, EdTech firm Instructure discloses cyber incident, probes impact, Security Boulevard (last visited May 7, 2026), https://securityboulevard.com/2026/05/edtech-firm-instructure-discloses-cyber-incident-probes-impact/.
[7] WITN, supra.

9.      Plaintiff brings this action on behalf of himself and a Nationwide Class and a North Carolina Subclass of similarly situated individuals, seeking damages, equitable relief, and injunctive relief to compel Defendant to adopt reasonable data security practices, to provide adequate individualized notice and identity-monitoring services, and to compensate Class Members for the substantial harm Defendant's conduct has caused.

## II. PARTIES

### A. Plaintiff

10.     Plaintiff Ethan Steinhoff is, and at all relevant times was, a citizen of the State of North Carolina. Plaintiff is an adult and a current student at East Carolina University, a public university located in Greenville, North Carolina, and part of the University of North Carolina System.

11.     Throughout his enrollment at East Carolina University, including at all times relevant to the Data Breach, Plaintiff used Canvas as the principal channel for accessing his coursework, submitting assignments, viewing grades, and communicating with faculty, staff, and classmates. In the course of that use, Plaintiff transmitted to and stored on Defendant's systems his full name, his ECU-issued email address, his ECU-issued student identification number, and the substantive contents of private communications conducted through the Canvas Inbox feature.

12.     On the morning of May 7, 2026, ECU formally notified its students, faculty, and staff — including Plaintiff — that they were impacted by the Data Breach, and urged recipients to remain cautious of suspicious emails or messages referencing the breach.[8] As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer the injuries described herein, including imminent and substantially heightened risk of phishing,

---

[8] WITN, supra.

impersonation, and identity-related fraud, lost time and effort responding to the breach, diminution in value of the Private Information, and loss of privacy in the contents of his Canvas Inbox communications.

**B. Defendant**

13.     Defendant Instructure, Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121. Defendant is the developer, owner, and operator of the Canvas learning management system.

14.     Defendant is a citizen of Delaware and Utah for purposes of 28 U.S.C. § 1332. Defendant transacts substantial and continuous business throughout the United States, including in this District, by licensing Canvas and related services to thousands of educational institutions and by collecting, processing, and storing Private Information from tens of millions of American students, faculty, and staff.

### III. JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000; the proposed Class consists of more than 100 members; and at least one Class Member, including Plaintiff, is a citizen of a State (North Carolina) different from at least one Defendant's State of citizenship (Delaware and Utah). 28 U.S.C. § 1332(d)(2)(A).

16.     This Court has personal jurisdiction over Defendant because Defendant maintains its headquarters and principal place of business in this District and is therefore "at home" in the District of Utah for purposes of general personal jurisdiction.[9]

---

[9] *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

6

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District for venue purposes. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendant's corporate decisions concerning the design, implementation, and oversight of the data security policies, controls, and incident-response procedures applicable to the Canvas environment, and the corporate decisions concerning post-2025 Incident remediation that are at the heart of this case.

## IV. FACTUAL ALLEGATIONS

### A. Defendant's Business and the Sensitive Data It Collects

18.     Defendant operates Canvas, a leading learning management system in the United States. Canvas is licensed to and used by thousands of educational institutions, including public and private universities, community colleges, and K-12 school districts. Plaintiff's institution, East Carolina University, is among the colleges and universities that license and use Canvas as their primary learning management system. The North Carolina Department of Public Instruction has confirmed that NCDPI and "some North Carolina Public School Units" were impacted by the Data Breach.[10]

19.     To use Canvas, students, faculty, and staff are required to provide and generate personal information including, at a minimum: full names; email addresses (including institution-assigned addresses that frequently incorporate the user's real name); student or employee identification numbers; and the substantive contents of communications conducted among users through the Canvas Inbox feature.

---

[10] WITN, supra.

20. The Canvas Inbox feature functions as a private messaging system within the platform. Through it, students communicate with faculty about academic difficulties, accommodations, attendance, family circumstances, mental-health-related circumstances, and other sensitive matters; students communicate with one another about coursework, social relationships, and personal issues; and faculty and staff communicate with students about academic and disciplinary matters. Defendant has acknowledged that the contents of messages exchanged among Canvas users are among the categories of data accessed in the Data Breach.

21. Information transmitted through Canvas constitutes "education records" within the meaning of FERPA, 20 U.S.C. § 1232g(a)(4)(A), to the extent the records are maintained by a covered educational agency or institution or by a party acting for such agency or institution. As a vendor that processes such records on behalf of educational institutions like East Carolina University, Defendant has acknowledged — in marketing materials, in contracts with school customers, and in public-facing privacy disclosures — that it functions as a "school official" for purposes of the FERPA "school official" exception, 34 C.F.R. § 99.31(a)(1)(i)(B), and that it is bound by FERPA's confidentiality obligations with respect to the data in its custody.

22. Defendant has publicly held itself out as a trusted steward of this data. Defendant's privacy policies and security disclosures represent that Defendant maintains "industry-standard" administrative, physical, and technical safeguards designed to protect personal information from unauthorized access, use, or disclosure.[11]

23. Defendant's sophisticated institutional customers paid Defendant substantial license fees in reliance on those representations. Those institutions in turn required their students — including Plaintiff — to use Canvas as a condition of accessing the courses for which the

---

[11] See Product Privacy Notice, Instructure, https://www.instructure.com/policies/product-privacy-policy (last visited May 7, 2026).

students paid tuition. The students themselves had no meaningful ability to negotiate, opt out, or withhold their data; for them, use of Canvas was a condition of their education.

**B. The September 2025 Predecessor Incident Put Defendant on Actual Notice**

24.    In or around September 2025, Defendant publicly disclosed a separate cybersecurity incident affecting its corporate Salesforce environment. Defendant attributed that incident to a social-engineering attack by an unauthorized criminal threat actor and disclosed it through customary corporate channels.[12]

25.    The 2025 Incident put Defendant on direct, actual notice that: (a) Defendant was a target of organized criminal threat actors; (b) Defendant's data environments were susceptible to compromise; and (c) Defendant's existing security posture — including its access controls, credential management, monitoring, and incident response — had proven inadequate to prevent unauthorized access to data in its custody.

26.    A reasonable enterprise of Defendant's size, sophistication, and data sensitivity, having been compromised by a criminal threat actor in 2025, would have undertaken a comprehensive review and hardening of its data security posture, including without limitation: enhanced credential management; rotation of API keys and secrets; implementation of phishing-resistant multifactor authentication on all privileged and remote access; application of least-privilege principles across users and machine accounts; comprehensive logging, anomaly detection, and egress monitoring; segmentation of customer-facing data environments from corporate environments and from one another; and periodic third-party penetration testing focused on the techniques known to be in use against organizations like Defendant. Plaintiff alleges the foregoing solely to establish the duty of care owed by Defendant in the months following the 2025

---

[12] Joe Fay, EdTech firm Instructure discloses cyber incident, probes impact, Security Boulevard (last visited May 7, 2026), https://securityboulevard.com/2026/05/edtech-firm-instructure-discloses-cyber-incident-probes-impact/.

Incident, the foreseeability of the Data Breach, and the unreasonableness of Defendant's failure to harden its environment after the 2025 Incident.

27.     Whether or not the 2025 Incident shared an operational nexus with the Data Breach at issue here, the 2025 Incident gave Defendant timely, actual notice of an elevated threat environment and a corresponding obligation to remediate. Defendant's subsequent failure to do so adequately is independent evidence of breach of duty.

**C. The April-May 2026 Data Breach**

28.     On April 30, 2026, Defendant's public-facing status page reported disruptions to "tools relying on API keys." On information and belief, those disruptions were the visible symptoms of an active intrusion already underway in Defendant's systems.[13]

29.     On or about May 1, 2026, Defendant publicly acknowledged that it was the target of a cybersecurity incident "perpetrated by a criminal threat actor" and represented that it had retained outside forensic experts to investigate.[14]

30.     On or about May 2, 2026, Defendant updated its disclosure to state that the incident had been "contained" and that the affected information "consists of certain identifying information of users at affected institutions, such as names, email addresses, and student ID numbers, as well as messages among users."[15] Defendant has further represented that it has no indication that passwords, dates of birth, government-issued identifiers, or financial information were involved.[16]

31.     On or about May 3, 2026, ShinyHunters publicly listed Defendant on its dark-web data-leak site. The listing claimed that the threat actor had exfiltrated a substantial volume of data, including the records of users at thousands of educational institutions and including a substantial

---

[13] Instructure Status, https://status.instructure.com/incidents/9wm4knj2r64z (last visited May 7, 2026).
[14] Id.
[15] Id.
[16] WITN, supra.

volume of message content among Canvas users, and issued a public ransom demand: pay, or the data would be leaked. Plaintiff alleges these volumetric claims on information and belief based on the threat actor's own public statements and contemporaneous reporting; verification of the precise figures will await discovery.[17]

32.     On or about May 5, 2026, Defendant informed the North Carolina Department of Public Instruction that NCDPI and "some North Carolina Public School Units" were impacted by the Data Breach. NCDPI has stated that it does not yet have confirmation of which districts and charter schools are impacted and that Defendant is contacting affected districts directly as it confirms that information. Pitt County Schools has separately confirmed that it is investigating the Data Breach's impact.[18]

33.     On the morning of May 7, 2026, ECU notified its students, faculty, and staff — including Plaintiff — that they had been impacted by the Data Breach, while also stating that Canvas remained operational and urging recipients to remain cautious of suspicious emails or messages referencing the breach.[19]

34.     On information and belief, ShinyHunters has publicly stated that the Data Breach was carried out by exploiting a vulnerability in Defendant's systems. The precise mechanism of the intrusion has not been fully disclosed by Defendant. Independent reporting indicates that samples of the stolen data, reviewed by reputable security journalists, contain real names, email addresses, and other identifying information of individual users — corroborating the claim that the data was actually exfiltrated and is in the hands of the threat actor.[20]

---

[17] Ionut Arghire, EdTech Firm Instructure Discloses Data Breach, SecurityWeek (last visited May 7, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/; Sergiu Gatlan, Instructure confirms data breach as ShinyHunters claims attack, BleepingComputer (last visited May 7, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/.
[18] WITN, supra.
[19] Id.
[20] BleepingComputer, supra.

35.    ShinyHunters is a known criminal extortion group with a documented history of leaking stolen data publicly when its ransom demands are not met. The risk that the Private Information of Plaintiff and the Class will be released onto criminal forums is therefore not speculative; it is imminent and substantially likely.

**D. The Sensitivity of the Compromised Data**

36.    Although the Private Information confirmed compromised in the Data Breach does not, as Defendant has represented it, include passwords, dates of birth, government-issued identifiers, or financial information, the dataset that has been compromised is nonetheless highly sensitive. Names and institution-issued email addresses, combined with student identification numbers and the contents of private messages, can be used by criminals to construct extraordinarily convincing phishing and social-engineering attacks targeted at users and their institutions. A criminal armed with the contents of a student's private communications with a faculty member — including references to specific assignments, deadlines, classmates, or personal circumstances — can craft messages that are virtually indistinguishable from legitimate university correspondence.

37.    ECU itself, in its May 7, 2026 notification, urged its community to remain cautious of suspicious emails or messages referencing the Data Breach — a public acknowledgment by Plaintiff's institution that the compromised dataset creates a heightened, ongoing risk of targeted phishing and impersonation.[21]

38.    The compromised Canvas Inbox messages may also reveal information that is not, on its face, classically "identifying" — information about a student's academic difficulties, accommodations, family circumstances, or other personal matters disclosed in the course of communications with faculty, staff, or classmates. The disclosure of such information to a criminal

---

[21] WITN, supra.

threat actor, and its threatened public release, is itself a serious privacy injury independent of any downstream financial fraud.

39.     Stolen personal information of the type compromised in the Data Breach has commercial value on criminal forums. Comprehensive personal information packages — even where they do not include traditional financial identifiers — are routinely advertised and sold on dark-web marketplaces, with prices reflecting the long-term utility of the underlying data. The unauthorized exfiltration and threatened public release of Plaintiff's and Class Members' Private Information has caused a measurable diminution in the value of that information as a species of personal property.

**E. Defendant's Inadequate Cybersecurity Practices**

40.     The class of attack carried out against Defendant — unauthorized access to a sensitive cloud data environment, followed by large-volume exfiltration and an extortion demand — has been the subject of repeated, public, and detailed warnings from federal cybersecurity authorities for years. The methods to defend against it are well understood, broadly available, and within the operational and financial means of any enterprise of Defendant's scale.

41.     The U.S. Cybersecurity and Infrastructure Security Agency ("CISA"), together with the Federal Bureau of Investigation, the National Security Agency, and the Multi-State Information Sharing and Analysis Center, jointly publish and regularly update the #StopRansomware Guide, a comprehensive set of best practices for preventing and responding to ransomware and data extortion incidents. The Guide is freely available, expressly intended for organizations of every size and sector, and aligned with CISA's Cross-Sector Cybersecurity

13

Performance Goals — themselves derived from the National Institute of Standards and Technology Cybersecurity Framework.[22]

42.     Among the prevention practices the Guide and analogous federal guidance identify as foundational are: enforcing phishing-resistant multifactor authentication on privileged and remote access; applying the principle of least privilege across users, services, and machine accounts (including API tokens and service-account credentials); maintaining an inventory and rotation policy for secrets, keys, and tokens; segmenting customer data environments from corporate environments and from one another; deploying network and endpoint monitoring sufficient to detect anomalous data access and large-volume egress; logging and retaining authentication and data-access events at a granularity sufficient to support detection and forensic reconstruction; promptly applying security updates to internet-facing assets; and conducting regular vulnerability scanning and red-team exercises against externally exposed systems.

43.     Industry frameworks reinforce the same expectations. The Center for Internet Security's Critical Security Controls, NIST Cybersecurity Framework Version 2.0, and NIST Special Publication 800-53 Revision 5 each specify the technical and administrative safeguards expected of an enterprise that processes sensitive personal information at scale.[23] These frameworks have been recognized by federal regulators, courts, and state attorneys general as benchmarks for "reasonable" data security.

44.     Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), prohibits "unfair . . . acts or practices in or affecting commerce." The Federal Trade Commission has long recognized, and federal courts have endorsed, that a company's failure to maintain reasonable and

---

[22] #StopRansomware Guide, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited May 7, 2026).
[23] NIST, Cybersecurity Framework (CSF) 2.0 (Feb. 26, 2024); NIST SP 800-53 Rev. 5 (Sept. 2020); CIS Critical Security Controls v8.1.

appropriate data security for consumers' personal information may constitute an unfair act or practice in violation of Section 5.[24] Plaintiff alleges Section 5 not as a private cause of action, which it does not provide, but as evidence of the standard of care to which Defendant was subject.

45.    Defendant's security failures fell well below these standards. On information and belief, Defendant failed to: (a) implement and enforce reasonable access controls, including least-privilege principles, on systems containing user data; (b) implement and enforce phishing-resistant multifactor authentication on all privileged accounts and API integrations; (c) properly scope, rotate, and monitor API keys and machine credentials, particularly following the 2025 Incident; (d) maintain effective intrusion-detection and anomaly-monitoring controls sufficient to detect a multi-day exfiltration of data on the scale alleged by ShinyHunters; (e) segment customer data environments from corporate environments and from one another; (f) implement reasonable encryption and tokenization of sensitive data at rest where appropriate; (g) conduct rigorous third-party penetration testing focused on the techniques used by known threat actors targeting Defendant; and (h) timely remediate the security weaknesses exposed by the 2025 Incident.

46.    On information and belief, Defendant failed to satisfy minimum requirements of NIST Cybersecurity Framework 2.0, including without limitation controls governing identity and access management (PR.AA-01 through PR.AA-05), data security and protection (PR.DS-01, PR.DS-02, and PR.DS-10), platform and configuration management (PR.PS-01, PR.PS-02, and PR.PS-05), and continuous monitoring and detection (DE.CM-01, DE.CM-03, DE.CM-06, and DE.CM-09).

47.    The fact that an unauthorized criminal threat actor successfully accessed Defendant's environment and exfiltrated user data on the scale alleged, using credentials and

---

[24] See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

15

access pathways that did not generate a timely or effective response, is itself probative evidence that Defendant did not implement these widely available controls in a manner sufficient to fulfill its obligations to Plaintiff and the Class.

## F. Defendant's Inadequate Notice and Response

48.    Defendant's post-breach response has further harmed Plaintiff and the Class. Defendant has not provided complete or individualized notice to most affected users. Instead, Defendant has issued generic public statements through corporate channels and has effectively delegated individualized notification to the affected institutions — many of which themselves do not yet know the full scope of their exposure or the identities of all affected users. As of May 7, 2026, NCDPI publicly stated that it did not yet have confirmation of which districts and charter schools were impacted.[25]

49.    Defendant has not offered Plaintiff or the Class identity-theft monitoring, dark-web monitoring, identity-restoration services, or other remedial measures of a duration commensurate with the long-term risks of the Data Breach — including the heightened risk of phishing and impersonation that flows directly from the compromise of users' institution-issued identifiers and the contents of their private communications.

### V. PLAINTIFF-SPECIFIC ALLEGATIONS

50.    Plaintiff is, and at all relevant times was, an adult resident of and citizen of the State of North Carolina.

51.    Plaintiff is currently enrolled as a student at East Carolina University, a public university located in Greenville, North Carolina, and part of the University of North Carolina System.

---

[25] WITN, supra.

16

52.    During his enrollment, including at all times relevant to the Data Breach, Plaintiff was required by East Carolina University to use the Canvas learning management system as the principal channel for accessing his coursework, submitting assignments, viewing grades, and communicating with faculty, staff, and classmates. Plaintiff used Canvas continuously for these purposes, including throughout the spring 2026 academic term.

53.    In the course of that use, Plaintiff transmitted to and stored on Defendant's systems his full name, his ECU-issued email address, his ECU-issued student identification number, and the substantive contents of private communications conducted through the Canvas Inbox feature with faculty, staff, and other students. Those communications included, without limitation, communications concerning academic matters, course logistics, and other personal matters arising in the ordinary course of his university experience.

54.    On the morning of May 7, 2026, ECU notified its students, faculty, and staff — including Plaintiff — that they were impacted by the Data Breach, and urged recipients to remain cautious of suspicious emails or messages referencing the breach.[26]

55.    Plaintiff has a reasonable expectation of privacy in the contents of his Canvas Inbox communications, in his ECU-issued student identification number, and in the other Private Information collected and stored by Defendant in the course of his enrollment. Plaintiff entrusted that information to Defendant in confidence, with the understanding that Defendant would safeguard it consistent with industry-standard data security practices and the obligations of a vendor processing FERPA-protected education records on behalf of an educational institution.

56.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer concrete and particularized injuries, including: (a) actual loss of privacy in

---

[26] WITN, supra.

the contents of his Canvas Inbox communications and other Private Information; (b) imminent and substantially heightened risk of phishing, impersonation, and identity-related fraud, including through highly contextualized social-engineering attacks crafted using the contents of his university communications and identifiers — a risk Plaintiff's own institution publicly acknowledged in its May 7, 2026 notification; (c) lost time and effort responding to the Data Breach, including time spent reviewing the institutional notification and contemporaneous news reports, monitoring his university and personal email accounts for phishing and impersonation attempts, and adopting protective measures; (d) diminution in the value of the Private Information he was required to provide as a condition of his education; and (e) anxiety, distress, and concerns about the long-term consequences of the unauthorized disclosure of his Canvas communications.

57.   Plaintiff retains a continuing interest in ensuring that the Private Information remaining in Defendant's custody is protected and safeguarded against further unauthorized access or disclosure.

## VI. CLASS ACTION ALLEGATIONS

58.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of the following Class and Subclass:

> Nationwide Class: All persons residing in the United States whose Private Information was accessed, exfiltrated, compromised, or otherwise impacted in the Data Breach.
>
> North Carolina Subclass: All members of the Nationwide Class who were residents of North Carolina at the time of the Data Breach.

59.   The Nationwide Class and the North Carolina Subclass are referred to collectively as the "Class."

60.   Excluded from the Class are: (a) Defendant, its officers, directors, employees, subsidiaries, affiliates, and successors; (b) the judge and magistrate judge presiding over this action

18

and members of their immediate families and judicial staff; and (c) any persons who timely opt out of the Class.

61.    Plaintiff reserves the right to amend, modify, or refine the Class definitions — including to add, modify, or eliminate subclasses — as discovery proceeds and the contours of the Data Breach become better understood, including without limitation the right to add a Minor Subclass with an appropriate representative.

62.    Numerosity — Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is impracticable. Based on Defendant's public statements and contemporaneous reporting, the Nationwide Class consists of millions of members. The North Carolina Subclass consists of thousands of members at minimum, including students, faculty, and staff at East Carolina University, NCDPI-administered schools, the North Carolina Public School Units identified by NCDPI as impacted, and other North Carolina educational institutions that license Canvas.[27] The exact number and identities of Class Members are within Defendant's exclusive knowledge and control and can be determined from Defendant's records and the records of Defendant's institutional customers.

63.    Commonality — Fed. R. Civ. P. 23(a)(2). There are numerous questions of law and fact common to the Class, including without limitation: (a) whether Defendant owed Plaintiff and the Class a duty to implement reasonable data security practices; (b) whether Defendant breached that duty; (c) whether Defendant's data security practices were unreasonable in light of the size and sensitivity of the data in its custody and the warnings provided by the 2025 Incident; (d) whether Defendant's conduct constituted a breach of implied contract or breach of confidence; (e) whether Defendant has been unjustly enriched at the expense of Plaintiff and the Class; (f) whether

---

[27] See WITN, supra.

Defendant's conduct constituted unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., as to members of the North Carolina Subclass; (g) whether the Class is entitled to actual, statutory, and treble damages; and (h) whether the Class is entitled to declaratory and injunctive relief, including the imposition of reasonable data security practices and the provision of identity-monitoring services.

64.     Typicality — Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of the Class. Plaintiff and the Class were all subject to the same data security practices of Defendant, all entrusted Private Information to Defendant in the same manner, all had their Private Information compromised in the same Data Breach, and all sustained injuries arising from the same course of conduct by Defendant. Plaintiff's claims arise from the same legal theories as those of the absent Class Members.

65.     Adequacy — Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class. Plaintiff's interests are aligned with, and not antagonistic to, the interests of the absent Class Members. Plaintiff has retained counsel with substantial experience prosecuting consumer class actions, including data privacy and data breach class actions. Counsel is committed to vigorously prosecuting this action.

66.     Predominance and Superiority — Fed. R. Civ. P. 23(b)(3). The questions of law and fact common to the Class predominate over any questions affecting only individual members. Defendant's data security practices, the existence and adequacy of those practices, Defendant's breach of duty, and Defendant's violation of state consumer-protection statutes can be proved on a class-wide basis using common evidence.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members, while real,

20

are small in relation to the expense and burden of individual litigation. It would be impracticable for the vast majority of Class Members to seek redress on an individual basis. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail.

68.     Injunctive and Declaratory Relief — Fed. R. Civ. P. 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and corresponding declaratory relief with respect to the Class as a whole. Class certification under Rule 23(b)(2) is appropriate as to Plaintiff's claims for declaratory and injunctive relief.

69.     Issue Class — Fed. R. Civ. P. 23(c)(4). In the alternative, the Court may certify particular issues for class treatment under Rule 23(c)(4), including without limitation the existence and scope of Defendant's duty of care, breach of that duty, the fact of injury, and Defendant's liability.

## VII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Nationwide Class)*

70.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

71.     Defendant owed Plaintiff and the Class a duty of reasonable care in the collection, storage, and protection of their Private Information. That duty arose from, among other sources: (a) Defendant's special relationship with Plaintiff and the Class as the custodian of their Private Information; (b) Defendant's status as a vendor processing FERPA-protected education records on behalf of educational institutions, governed by 20 U.S.C. § 1232g and 34 C.F.R. §

21

99.31(a)(1)(i)(B); (c) Defendant's undertaking, through public-facing privacy and security disclosures, to protect such information; (d) Defendant's actual knowledge of the 2025 Incident and the demonstrably elevated threat environment that followed; and (e) the foreseeable and serious harm to Plaintiff and the Class that would result from a breach.

72.     The standard of care applicable to Defendant's data security obligations is informed by, among other sources: (a) Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the FTC's longstanding interpretation of that provision as requiring reasonable data security practices, see, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015); (b) FERPA, 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. Part 99, as to a vendor that processes education records on behalf of educational institutions; (c) the CISA #StopRansomware Guide and CISA Cross-Sector Cybersecurity Performance Goals; (d) NIST Cybersecurity Framework Version 2.0 and NIST Special Publication 800-53 Revision 5; and (e) the Center for Internet Security Critical Security Controls. Plaintiff invokes these sources solely as evidence of the standard of care; Plaintiff does not assert a private right of action under Section 5 or FERPA.

73.     Defendant breached its duty of care through, inter alia, its failure to implement and maintain reasonable administrative, physical, and technical safeguards as alleged above, including its failure to adequately remediate after the 2025 Incident.

74.     Defendant's breaches were the actual and proximate cause of the harm suffered by Plaintiff and the Class. Defendant's breaches both increased the likelihood of, and made possible, the Data Breach.

75.     Plaintiff and the Class suffered cognizable injuries as alleged above, including imminent and substantially heightened risk of phishing, impersonation, and identity-related fraud;

22

lost time; out-of-pocket expenses; diminution in value of their Private Information; and loss of privacy.

76.     The economic-loss rule does not bar Plaintiff's negligence claim because Defendant's duty arises from sources independent of any contract, including statutory and common-law duties to safeguard sensitive personal information and the duties imposed on a custodian of FERPA-protected education records.

## COUNT II
## BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiff and the Nationwide Class)*

77.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

78.     Plaintiff and the Class entered into implied contracts with Defendant. Through institutional licensing arrangements with educational institutions, Defendant collected Private Information from Plaintiff and the Class. As a condition of accessing Canvas — which was, in turn, a condition of accessing their education — Plaintiff and the Class provided Private Information to Defendant. In exchange, Defendant impliedly promised to safeguard that Private Information using reasonable measures, to comply with applicable privacy laws, and to provide adequate notice in the event of a breach.

79.     Defendant breached these implied contracts by failing to safeguard the Private Information, by failing to comply with applicable privacy laws, and by failing to provide timely and adequate individualized notice of the Data Breach.

80.     Plaintiff and the Class suffered damages as a direct and proximate result of those breaches.

## COUNT III
## BREACH OF CONFIDENCE
*(On Behalf of Plaintiff and the Nationwide Class)*

23

81.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

82.     Plaintiff and the Class disclosed Private Information to Defendant in confidence. The confidential nature of that disclosure was understood by both parties and was reinforced by Defendant's privacy and security representations, by the FERPA framework governing student education records, and by the inherently confidential nature of communications conducted through the Canvas Inbox feature.

83.     Defendant assumed a duty of confidentiality with respect to the Private Information. Defendant breached that duty by failing to use reasonable measures to safeguard the Private Information from unauthorized disclosure.

84.     As a direct and proximate result of Defendant's breach of confidence, Plaintiff and the Class suffered damages, including loss of privacy, lost time, out-of-pocket expenses, and diminution in value of the Private Information.

**COUNT IV**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class — Pleaded in the Alternative)*

85.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein. This Count is pleaded in the alternative to Plaintiff's contract-based claims.

86.     Defendant received and benefited from the Private Information of Plaintiff and the Class. Defendant used that Private Information — directly and as a component of its institutional value proposition — to generate substantial revenues, including through the licensing of Canvas to thousands of educational institutions.

87.     A portion of the consideration paid to Defendant by educational institutions reflected the cost of providing reasonable data security — i.e., security for which institutional

24

licensees paid and which their students were entitled to receive as third-party beneficiaries of those licenses.

88.     Defendant retained those benefits while failing to provide reasonable data security. Under the circumstances, it would be inequitable for Defendant to retain the benefits without adequate compensation to Plaintiff and the Class.

**COUNT V**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
*(On Behalf of Plaintiff and the Nationwide Class)*

89.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

90.     Pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, an actual controversy has arisen between Plaintiff and the Class, on the one hand, and Defendant, on the other, concerning Defendant's legal obligations with respect to the Private Information in its custody.

91.     Plaintiff seeks a declaration that: (a) Defendant's data security practices were and are inadequate; (b) Defendant owes a continuing duty to Plaintiff and the Class to implement and maintain reasonable data security measures; and (c) Defendant must provide individualized notice and long-term identity-monitoring and identity-restoration services to Plaintiff and the Class.

92.     Plaintiff further seeks injunctive relief requiring Defendant to: (a) implement and maintain reasonable data security practices, including the controls identified above; (b) submit to ongoing third-party security audits; (c) provide identity-theft monitoring, dark-web monitoring, identity-restoration services, and phishing-and-impersonation protection for the Class for a period of not less than ten years; (d) provide individualized notice to all affected Class Members in plain language; and (e) such other equitable relief as the Court deems just.

**COUNT VI**

25

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1.1, ET SEQ.**
*(On Behalf of Plaintiff and the North Carolina Subclass)*

93.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

94.    The North Carolina Unfair and Deceptive Trade Practices Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[28] An act or practice is "unfair" within the meaning of the statute if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.[29]

95.    Plaintiff and members of the North Carolina Subclass are within the class of persons protected by N.C. Gen. Stat. § 75-1.1. Defendant's conduct in collecting, processing, and storing the Private Information of Plaintiff and members of the North Carolina Subclass occurred in or affected commerce within the meaning of the statute.

96.    Defendant engaged in unfair acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1, including by: (a) failing to implement and maintain reasonable data security measures appropriate to the volume, sensitivity, and special legal status of the data in its custody, including the failures detailed above and judged against the standards established by Section 5 of the FTC Act, FERPA, the CISA #StopRansomware Guide, NIST Cybersecurity Framework 2.0, and the CIS Controls; (b) failing to remediate known security weaknesses exposed by the 2025 Incident in the months that followed; (c) misrepresenting, expressly and impliedly through its public-facing privacy and security disclosures, the adequacy of its data security practices and its compliance with applicable privacy laws; (d) failing to provide timely, complete,

---

[28] N.C. Gen. Stat. § 75-1.1(a).
[29] Marshall v. Miller, 302 N.C. 539, 548 (1981).

26

and individualized notice of the Data Breach to affected North Carolina residents, instead delegating individualized notification to thousands of affected institutions over an extended period; and (e) causing the loss of Plaintiff's and the North Carolina Subclass's privacy in the contents of confidential communications conducted through the Canvas Inbox feature, and exposing Plaintiff and the North Carolina Subclass to a heightened, ongoing risk of phishing and impersonation that ECU itself publicly recognized in its May 7, 2026 notification.

97.    Defendant's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and members of the North Carolina Subclass.

98.    As a direct and proximate result of Defendant's violations of N.C. Gen. Stat. § 75-1.1, Plaintiff and members of the North Carolina Subclass suffered actual injury as alleged above, including loss of privacy, lost time, out-of-pocket expenses, diminution in value of Private Information, and imminent and substantially heightened risk of phishing, impersonation, and identity-related fraud.

99.    Plaintiff and members of the North Carolina Subclass are entitled to recover actual damages, treble damages, and reasonable attorneys' fees pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all members of the proposed Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.  An order certifying the proposed Nationwide Class and North Carolina Subclass under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

B.  Declaratory relief as set forth in Count V;

C.  Injunctive relief, including an order requiring Defendant to implement and maintain reasonable data security practices, to submit to ongoing third-party security audits, and to provide individualized notice and long-term identity-theft monitoring, dark-web monitoring, identity-restoration services, and phishing-and-impersonation protection to all affected Class Members;

D.  An award of compensatory damages in an amount to be determined at trial;

E.  An award of statutory and treble damages where authorized by law, including under N.C. Gen. Stat. § 75-16 as to Count VI;

F.  An award of restitution and disgorgement of all benefits unjustly retained by Defendant;

G.  Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H.  An award of reasonable attorneys' fees, costs, and litigation expenses, including under N.C. Gen. Stat. § 75-16.1, the common-fund doctrine, and any other applicable law; and

I.  Such other and further relief as the Court deems just and proper.

## IX. JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

28

Dated: May 7, 2026

MARSHALL OLSON & HULL, PC

BY:    /s/Jason R. Hull
       JASON R. HULL

BRYSON HARRIS SUCIU & DEMAY, PLLC
       SCOTT J. FALGOUST*

*Attorneys for Plaintiff and the Proposed Class*

*\* pro hac vice forthcoming*

29